**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT DAVID RIGOT, | ) | CASE NO. 1:21-CV-01575-DAR |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL |
| SECURITY ADMINISTRATION, | ) | ARMSTRONG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Robert David Rigot ("Mr. Rigot") seeks judicial review of the final decision of the Commissioner of Social Security denying in part his application for Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b) after the Court rejected my prior report and recommendation and returned the case to me for further proceedings. (*See* ECF non-document entry dated September 2, 2022; ECF No. 19). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

On May 23, 2013, Mr. Rigot filed his application for SSI. (Tr. 181). Mr. Rigot listed the following physical and mental conditions that limited his ability to work: mental illness, depression, bipolar disorder, problems with concentration and work, and lower back problems. (Tr. 193).

The Social Security Administration ("SSA") denied Mr. Rigot's application initially and

1

upon reconsideration. (Tr. 124, 136). Mr. Rigot requested a hearing before an administrative law judge ("ALJ"). (Tr. 141). The ALJ held a hearing on April 3, 2015, at which Mr. Rigot was represented by counsel. (Tr. 29). On June 8, 2015, the ALJ issued a written decision finding that Mr. Rigot is not disabled. (Tr. 8). The ALJ's decision became final on July 15, 2016, when the Appeals Council declined further review. (Tr. 1).

On August 26, 2016, Mr. Rigot filed a complaint in this court, captioned *Rigot v. Colvin*, Case No. 1:16-cv-02141-CAB, challenging the Commissioner's final decision. On March 24, 2017, Mr. Rigot and the Commissioner filed a joint motion to reverse the Commissioner's decision and remand the case to the Commissioner for further consideration. (*Id*. at ECF No. 13). The court granted the joint motion on March 28, 2017. (*Id*. at ECF No 14).

On May 1, 2018, the ALJ held a second hearing, at which Mr. Rigot was represented by counsel. (Tr. 918). On November 15, 2018, the ALJ issued a written decision again finding that Mr. Rigot is not disabled. (Tr. 894). The ALJ's decision became final on November 18, 2019, when the Appeals Council declined further review. (Tr. 888).

On January 16, 2020, Mr. Rigot filed a complaint in this court, captioned *Rigot v. Saul*, Case No. 1:20-cv-00101-JSG, challenging the Commissioner's final decision. On June 16, 2020, the parties filed a joint proposed stipulation to remand the case to the Commissioner. (*Id*. at ECF No. 11). On July 15, 2020, the court entered an order remanding the case for further proceedings. (*Id*. at ECF No. 12).

On July 27, 2020, the Appeals Council issued an order vacating the ALJ's decision and remanding the case to the ALJ pursuant to the court's order. (Tr. 1759). The Appeals' Council's remand order instructed the ALJ to give further consideration to the opinions of Mr. Rigot's treating physicians and to the mental treatment record. (Tr. 1761-62). The Appeals Council also instructed the ALJ to obtain additional evidence regarding Mr. Rigot's impairments to complete

the administrative record. (Tr. 1762). The Appeals Council further instructed the ALJ to: (1) give further consideration to the treating, non-treating, and non-examining source opinions and explain the weight given to that evidence; (2) further evaluate Mr. Rigot's alleged symptoms and provide a rationale consistent with the disability regulations regarding the evaluation of those symptoms; (3) further evaluate Mr. Rigot's mental impairments, providing specific findings and appropriate rationale for each functional area; (4) give further consideration to Mr. Rigot's residual functional capacity; and (5) if warranted, obtain supplemental evidence from a vocational expert. *Id*. The appeals counsel also assigned the case to a new ALJ on remand. *Id*.

On November 2, 2020, the ALJ held a telephonic hearing, at which Mr. Rigot was represented by counsel. (Tr. 1742). At that hearing, the ALJ stated, "I think I should get a medical expert" with respect to whether Mr. Rigot required a controlled environment to remain sober and able to work given his substance abuse issues. (Tr. 1752-53). Mr. Rigot's counsel responded that Mr. Rigot had no objection to a medical expert. (Tr. 1753-54).

On March 5, 2021, the ALJ held another telephonic hearing, at which Mr. Rigot was represented by counsel. (Tr. 1686). Mr. Rigot testified, as did the medical expert that the ALJ had obtained, Dr. Aaron Williams, as well as an impartial vocational expert ("VE"). On April 21, 2021, the ALJ issued a written decision finding that Mr. Rigot became disabled on April 15, 2021 but was not disabled prior to that date. (Tr. 1629).

On August 13, 2021, Mr. Rigot filed his Complaint, challenging the Commissioner's final decision that Mr. Rigot was not disabled prior to April 15, 2021. (ECF No. 1). On March 3, 2023, I issued a report and recommendation recommending that the Court reverse the Commissioner's decision and remand the case for further consideration of whether Mr. Rigot's mental health impairments met or medically equaled a listing. On March 27, 2024, the Court rejected my recommendation and returned the case to me to "complete the sequential analysis of the ALJ's

decision beyond Step Three and issue a new report and recommendation subject to objection by the parties and further consideration thereafter." (ECF No. 19). On April 8, 2024, I ordered Mr. Rigot to file a supplemental brief indicating whether he believed any issued existed beyond those raised in his initial briefing. (*See* ECF non-document entry dated April 8, 2024). On May 6, 2024, Mr. Rigot filed his supplemental brief, asserting the  following assignment of error:

(1) The ALJ failed to comply with the legal requirements of SSRs 96-8p, 85-16-3p and Listing 12.00 (D) and when she fashioned Mr. Rigot's RFC; consequently, it does not accurately portray his functional limitations.

(ECF No. 20, PageID # 2527). The Commissioner filed a response brief on May 23, 2024 (ECF No. 21), and Mr. Rigot filed a reply on June 6, 2024 (ECF No. 22).

## III.    BACKGROUND

### A.    <u>Personal, Educational, and Vocational Experience</u>

 Mr. Rigot was born in 1966. (Tr. 181). Mr. Rigot graduated from high school. (Tr. 1674). He does not have any recent work experience, but previously worked in various jobs, including as a dishwasher, a food delivery person, at a garage, and in temporary positions through a temp agency. (Tr. 1729-1731).

### B.    <u>Relevant Hearing Testimony</u>

#### *1.    Mr. Rigot's Testimony*

Mr. Rigot testified that he talks to his sister every day, and that she reminds him of his appointments and the things he needs to take care of that day. (Tr. 1724-25). Mr. Rigot also testified that when he needs to go somewhere, he must find someone to give him a ride. (Tr. 1725). He testified that the Charak Center for Health and Wellness has a van or a car and brings someone to pick him up. *Id*. Mr. Rigot also testified that he attends three Alcoholics Anonymous meetings a week over the phone, and that he has a sponsor, with whom he speaks at least once a week. *Id*. Mr. Rigot further testified that he attended some music concerts with his sponsor prior to the

4

pandemic. (Tr. 1725-26).

Mr. Rigot testified that his case managers help him with going to appointments and with filling out applications. (Tr. 1726-27). Mr. Rigot testified that he "really need[s] help with that." (Tr. 1727). Mr. Rigot testified that he is trying to keep up with his finances, and that his case manager from the Far West Center, Linda Nichols, reminds him that he needs to pay his bills. (Tr. 1726). Mr. Rigot testified that he speaks with Ms. Nichols at least once a month. *Id*.

Mr. Rigot also testified that his sister helps him with his finances. *Id*. In addition, Mr. Rigot testified that his sister comes over to clean up the house and cook for him. *Id*. Mr. Rigot testified that he "can" cook and clean but "not very good." (Tr. 1728). He testified that he does not cook well and burns meals a lot and that it's "pretty much a wreck all the time." *Id*. Mr. Rigot further testified that he does not want to do anything given his depression. *Id*.

Mr. Rigot testified that he had difficulties with his prior jobs. *Id*. He testified that his employers would give him instructions and he would not be able to follow them. (Tr. 1728-29). Mr. Rigot also testified that when he worked as a dishwasher, he ended up breaking dishes and had trouble understanding the instructions for the job, and that when he delivered food, he would get lost. *Id*.

Mr. Rigot testified that in a typical day he wakes up around noon and mostly watches television. (Tr. 1731-32). Mr. Rigot also testified that he attends appointments if he has them, and that if he has to go to the store, he can walk. (Tr. 1732). Mr. Rigot testified that if he needs little things, he can do his own grocery shopping. *Id*. However, he testified that, on most occasions, either Ms. Nichols or someone from the Charak Center takes him grocery shopping. *Id*.

### 2. *Dr. Williams' Testimony*

Dr. Williams testified that there were some portions in the record that were "somewhat incongruent." (Tr. 1695). Dr. Williams testified that the record appeared to be consistent with

respect to Mr. Rigot's executive functioning and ability to problem solve. *Id*. However, Dr. Williams also testified that the treating source statements and medical opinions from Mr. Rigot's treating providers appeared to be "notably different in some rankings and ratings tha[n] what the day-to-day treatment records would suggest." (Tr. 1695).

With respect to executive functioning and problem solving, Dr. Williams agreed that Mr. Rigot would be able to understand and apply information for simple instructions, but that Mr. Rigot would not be capable of more than that. (Tr. 1695-96). Dr. Williams also opined that Mr. Rigot's records reflected mild to moderate depressive symptoms and mild to moderate impact. (Tr. 1696). However, Dr. Williams also testified that Mr. Rigot's treating statements "appear to suggest a much higher level of impairment." *Id*. Dr. Williams further testified, "I don't know if there's possibly something that gets lost in translation between those or if there's something that the raters are seeing that's not being captured in – in the documentation of the notes, but it's a pretty significant disparity I'd say . . . ." (Tr. 1697).

Dr. Williams testified that Mr. Rigot presents with criteria consistent with depression and/or bipolar disorder. (Tr. 1699). Dr. Williams also testified that it was "a little bit more challenging" to "interpret or to expand on" the borderline intellectual functioning diagnosis reflected in some of Mr. Rigot's medical records. (Tr. 1699-1700). Dr. Williams testified that it's "a diagnosis that I can see being present, it's just unfortunately isn't quite as supportive as the other diagnoses are." (Tr. 1700). Dr. Williams further testified that Mr. Rigot's diagnoses of opiate use disorder and cocaine use disorder were substantiated. *Id*.

Dr. Williams testified that Mr. Rigot had rated his depressive symptoms at various points as a four or a five out of ten, which indicates moderate depression, but that there were periods where Mr. Rigot's symptoms were more intensive, such as when he was hospitalized. (Tr. 1701-02). Dr. Williams also testified that these hospitalizations were related to aspects of depression

and suicidal ideation, but that they appeared to coexist with more active substance usage. (Tr. 1702). Dr. Williams opined that the substance use was probably exacerbating Mr. Rigot's existing symptoms, and that the hospitalizations were not reflective of a baseline set of symptoms. *Id*. Dr. Williams testified that he "didn't get anything about borderline intellectual function" because "it was a little more challenging, the information and the testing wasn't there . . . ." (Tr. 1703).

In response to questions from Mr. Rigot's counsel, Dr. Williams agreed that Mr. Rigot has "a high degree of structure and support" from the Charak Center, Far West, and other community resources. (Tr. 1717). Dr. Williams also agreed that Mr. Rigot appeared to benefit from that support, but testified that it was difficult to tell whether that support was a required element of Mr. Rigot's ability to function. (Tr. 1718). Dr. Williams further agreed that one possible explanation for the disparity between the evaluations of Mr. Rigot's treating physicians and the treatment notes is that the treatment notes were crafted with those support structures in place while the evaluations were determining how Mr. Rigot would function without them. (Tr. 1718-1719). Dr. Williams noted it was "possible" that borderline intellectual functioning would more significantly impact Mr. Rigot's attention and ability to maintain pace, but testified that he lacked sufficient information to make that determination on the existing record. (Tr. 1720).

### 3. *Vocational Expert's Testimony*

The ALJ asked the VE if there were jobs in sufficient numbers in the national economy for someone with Mr. Rigot's characteristics who could understand, remember, and carry out simple instructions in a routine work environment without strict production quotas; who could interact with the public, coworkers, and supervisors up to occasionally asking questions or clarifying instructions; but who could not engage in conflict resolution or directing the work of others or commercial driving. (Tr. 1732-33). The VE testified that someone with those characteristics could work as a marker, a garment sorter, or a classifier. (Tr. 1733). The ALJ then asked if there would

be jobs available for someone who would be off-task 10% of the day. (Tr. 1734). The VE responded that being employers would tolerate being off-task 10% of the day but that anything more than that would be work-preclusive. *Id*. In response to a question from Mr. Rigot's counsel, the VE also testified that if the individual were likely to miss work two or more times per month, that individual would not be able to maintain employment. (Tr. 1739).

### C.    Relevant Opinion Evidence[1]

#### 1.    *Deborah Koricke, Ph.D. and Nancy Caito, Ph.D.*

Drs. Koricke and Caito were treating psychologists of Mr. Rigot. On June 17, 2014, Drs. Koricke and Caito completed a "medical source statement of ability to do work-related activities (mental)." (Tr. 777). Drs. Koricke and Caito rated Mr. Rigot's impairment on a variety of attributes from "none" to "extreme." *Id*. Drs. Koricke and Caito determined that Mr. Rigot had an extreme impairment on ability to carry out complex instructions and ability to make judgments on complex work-related decisions. *Id*. Drs. Koricke and Caito rated Mr. Rigot as "marked" on each of the remaining categories. (Tr. 777-78). Dr. Koricke and Dr. Caito also made written comments, including "poor emotional control"; "Mr. Rigot is often confused & suffers from severe depression"; "he has limited social skills & struggles with spontaneous communication"; "poor self motivation"; and "poor coping skills for stressors." *Id*. Drs. Koricke and Caito also noted a history of many suicide attempts. (Tr. 778).

---

[1] At the administrative level, Mr. Rigot alleged both physical and mental impairments. In this proceeding, Mr. Rigot challenges only the ALJ's determination with respect to his mental impairments. Accordingly, I summarize only evidence regarding those impairments.

The ALJ gave their opinions "little weight."[2] (Tr. 1660). The ALJ concluded that the assessment was inconsistent with treating records because Mr. Rigot had been going to meetings and riding his bike one week prior to the assessment, and because he reported medication compliance and feeling better. (Tr. 1660). The ALJ also concluded that the opinions relied heavily on subjective reports. *Id*. Finally, the ALJ determined that the opinions were inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. *Id*.

### 2.     *Robert Brauer, MD and Bethany Longstaff, Therapist*

Dr. Brauer was a treating psychiatrist for Mr. Rigot, while Ms. Longstaff is a mental health specialist. On September 29, 2020, Ms. Longstaff completed an "assessment of ability to sustain work-related activities," in which she rated Mr. Rigot's ability to carry out various tasks on a scale from zero to 100. (Tr. 2091). Ms. Longstaff rated Mr. Rigot as between zero and 20% on every metric. (Tr. 2091-93). Ms. Longstaff also wrote that Mr. Rigot has "difficulty understanding & following instructions due to cognitive difficulties related to bipolar disorder/depression"; has "low intellectual ability, disorganized thought process, poor memory & difficulty comprehending information"; and "becomes extremely stressed w/ changes & has difficulty adapting to said changes." *Id*. Dr. Brauer co-signed Ms. Longstaff's assessment. (Tr. 2178-84).

The ALJ gave "little weight" to the opinions of Dr. Brauer and Ms. Longstaff. (Tr. 1658). The ALJ concluded that the record did not reflect that Dr. Brauer had a consistent history of treating Mr. Rigot while Ms. Longstaff was a case manager. *Id*. The ALJ also concluded that the assessment was vague and imprecise because it used circles to approximate levels of functioning

---

[2] Prior to March 27, 2017, SSA regulations provided that the opinions of treating physicians were to be given controlling weight absent evidence to the contrary. *See* 20 C.F.R. § 416.927; *Atwater v. Comm'r of Soc. Sec.*, No. 1:20-CV-00735, 2021 WL 3174339 (N.D. Ohio July 9, 2021), *report and recommendation adopted*, 2021 WL 3164390, at *10 (N.D. Ohio July 27. 2021). Because Mr. Rigot filed his application prior to March 27, 2017, the "treating physician" rule applies. The ALJ did not give controlling weight to any of Dr. Rigot's treating physicians, and instead determined that those opinions were entitled to little weight. Mr. Rigot has not argued that the ALJ erred in failing to apply controlling weight to his treating physicians, and has therefore waived that argument. *See Dultmyer v. Comm'r of Soc. Sec.*, No. 3:12 CV 2941, 2014 WL 991900, at *19 (N.D. Ohio Mar. 13, 2014) ("[plaintiff] does not refer to the treating physician rule and thus she has waived a treating physician rule argument")

and lacked narrative explanations. *Id*. The ALJ also stated that Dr. Brauer and Ms. Longstaff lacked examples to support their opinions. *Id*. Finally, the ALJ concluded that the assessment of Dr. Brauer and Ms. Longstaff was inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. *Id*.

        3.       **Edwardo D. Vazquez, MD**

Dr. Vazquez was a treating psychiatrist for Mr. Rigot. On August 28, 2012, Dr. Vazquez completed a medical source statement regarding Mr. Rigot's mental capacity to perform work on a sustained basis. (Tr. 323). The statement required Dr. Vazquez to rate Mr. Rigot on a scale from "poor" to "unlimited or very good" on a variety of workplace metrics. *Id*. Dr. Vazquez rated Mr. Rigot as "poor" in a number of categories, including: use judgment; deal with the public; relate to co-workers; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stress; complete a normal workday and work week without interruptions from psychologically based symptoms; understand, remember, and carry out complex job instructions; and understand, remember, and carry out detailed but not complex job instructions. (Tr. 323-24). Dr. Vazquez rated Mr. Rigot as "fair" in the remaining categories. *Id*.

The ALJ gave Dr. Vazquez's opinion "little weight." (Tr. 1662). The ALJ determined that Dr. Vazquez's opinion was not entitled to controlling weight because it was not consistent with the treating notes. *Id*. The ALJ also discounted Dr. Vazquez's opinion because Dr. Vazquez had not seen Mr. Rigot for four months and could not accurately evaluate his functioning. (Tr. 1662-63). The ALJ also determined that Dr. Vazquez's opinion was inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. (Tr. 1663).

        4.       **Richard N. Davis, M.A.**

Dr. Davis completed an evaluation of Mr. Rigot on July 22, 2013 at the request of the Ohio Division of Disability Determination. (Tr. 682). Dr. Davis concluded that Mr. Rigot was "limited

intellectually" and that it was difficult for Mr. Rigot to remember exact dates. (Tr. 684). Dr. Davis further noted that Mr. Rigot's math skills did not extend beyond simple addition and subtraction and that Mr. Rigot was very limited in his abilities to think logically and use common sense and judgment. (Tr. 685). When Mr. Rigot was given five words to remember for five minutes, he could only recall two of them. *Id*. Dr. Davis concluded that Mr. Rigot "is going to have difficulty in understanding, remembering and carrying out more than just the simplest of instructions." *Id*. Dr. Davis diagnosed Mr. Rigot with adjustment disorder with mixed anxiety and depressed mood, as well as borderline intellectual functioning. *Id*. Dr. Davis also stated that Mr. Rigot required assistance to deal effectively with many situations. (Tr. 686). However, Dr. Davis also concluded that Mr. Rigot was able to care for his personal needs. *Id*.

The ALJ gave Dr. Davis' opinion "little weight" because it was based on a one-time evaluation and did not accurately reflect Mr. Rigot's functioning. (Tr. 1665). The ALJ also concluded that Dr. Davis' opinion was "mostly vague" because Dr. Davis stated that Mr. Rigot would have "difficulty" in functioning without clarifying the degree of limitation. (Tr. 1665). Finally, the ALJ concluded that Dr. Davis' opinion was inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. *Id*.

### 5. *Carl Tishler, Ph.D. and Aracelis Rivera, Psy.D.*

Drs. Tishler and Rivera are state agency psychological consultants who provided opinions on August 13, 2013 and December 9, 2013 respectively. (Tr. 86, 106). Dr. Tishler opined that Mr. Rigot was markedly limited in his ability to carry out detailed instructions and moderately limited in his ability to respond appropriately to changes in the work setting; maintain attention and concentration; sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; and maintain socially appropriate behavior. (Tr.

100-01). Dr. Tishler also opined that Mr. Rigot would function best in settings where changes in tasks occurred on no more than an infrequent basis. (Tr. 102). On reconsideration, Dr. Rivera adopted the prior ALJ's RFC findings. (Tr. 118).

The ALJ gave "partial weight" to the opinions of Drs. Tishler and Rivera. (Tr. 1671). The ALJ found that Drs. Tishler and Rivera relied too heavily on a one-time consultative examination with respect to the conclusion that Mr. Rigot functions best in settings where changes occur on no more than an infrequent basis. (Tr. 1672). The ALJ found that there were "only a few instances" in the record showing issues with Mr. Rigot's thought processes. *Id*.

### 6.     *Tiffany Thornton, Certified Nurse Practitioner*

Ms. Thornton was a treating nurse practitioner of Mr. Rigot. On April 20, 2018, Ms. Thornton completed an "assessment of ability to sustain work-related activities (mental)," in which she rated Mr. Rigot's ability to carry out various tasks on a scale from zero to 100. (Tr. 1455). Ms. Thornton rated Mr. Rigot at between 20 and 40 on a variety of criteria, including the ability to: understand and remember very short and simple instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others; complete a normal workday and workweek without interruptions from psychologically based symptoms; maintain attention and concentration for extended periods; get along with co-workers or peers; respond appropriately to changes in work setting; and deal with ordinary work stress. (Tr. 1455-57). Ms. Thornton rated Mr. Rigot as a 50 out of 100 on the ability to carry out short and simple instructions and interact appropriately with the general public, and a 70 out of 100 on ability to maintain socially appropriate behavior. *Id*. Ms. Thornton also stated that Mr. Rigot has low to moderate ability to focus, manage stress, and work at an adequate pace and problems with thought organization. *Id*.

The ALJ gave Ms. Thornton's opinion "little weight." (Tr. 1669). The ALJ concluded that

Ms. Thornton did not provide an explanation for her opinions, and noted that she saw Mr. Rigot for Suboxone therapy rather than counseling. *Id*. The ALJ also concluded that Ms. Thornton's opinion was inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. *Id*.

### 7. *Linda Nichols*

Ms. Nichols was Mr. Rigot's case manager at Far West. (Tr. 1628). Ms. Nichols submitted a letter on April 24, 2018, stating that Mr. Rigot's depression and anxiety would not allow him to work full time. *Id*. Ms. Nichols stated that she meets with Mr. Rigot monthly to ensure he pays his bills, sticks to a budget, and performs activities of daily living. *Id*. Ms. Nichols further stated that without those visits, Mr. Rigot likely would not follow through with what he needs to do to manage his illness and his life. *Id*.

The ALJ gave Ms. Nichols' opinion "little weight." (Tr. 1667). The ALJ concluded that Ms. Nichols' opinion "subsumes the ultimate issue of disability," and that the record supported a greater level of functioning than Ms. Nichols noted. *Id*. The ALJ also stated that Ms. Nichols was not an acceptable medical source and concluded that her opinion was inconsistent with Mr. Rigot's examination, reported functioning, and other weighted medical opinions. *Id*.

### 8. *Sheryl Sexton-Bruno*

Ms. Sexton-Bruno is Mr. Rigot's sister. (Tr. 247). She submitted a letter stating that Mr. Rigot was in special learning disability classes throughout his childhood. *Id*. Ms. Sexton-Bruno stated that each time Mr. Rigot was employed, he was eventually let go because he could not comprehend instructions unless he was told what to do each step of the way. (Tr. 249). Ms. Sexton-Bruno further stated that Mr. Rigot has suffered for a long time with depression and other mental health issues. *Id*. Ms. Sexton-Bruno stated that she believes Mr. Rigot has been able to manage only because of all the help he receives from others. (Tr. 251).

The ALJ concluded that Ms. Sexton-Bruno's evidence did not establish that Mr. Rigot was disabled. (Tr. 1673). The ALJ found that the accuracy of Ms. Sexton-Bruno's observations and opinions was questionable because she is not medically trained and because she is not a neutral third-party. *Id*. Finally, the ALJ concluded that Ms. Sexton-Bruno's information was not consistent with the preponderance of the evidence. *Id*.

### D.      Relevant Medical Evidence[3]

Mr. Rigot received regular care for mental health issues from Far West beginning in May 2011. (Tr. 257-281; 325-646, 709-722). On May 30, 2013, it was noted that Mr. Rigot was attending group therapy sessions three times per week, which he reported were helpful. (Tr. 558). Mr. Rigot also reported that he had not been experiencing suicidal thoughts and was not having problems with his medication. *Id*. On November 11, 2013, Mr. Rigot similarly reported that his depression and anxiety levels were low and that he had not had any suicidal thoughts. (Tr. 709). It was also noted that Mr. Rigot's case manager accompanied him to pay his bills because he would often forget to do so in light of his anxiety. *Id*. On November 29, 2013, Mr. Rigot reported that he had begun an intensive outpatient program at Westgate and that he was attending three to four AA meetings per week. (Tr. 711). On January 1, 2014, Mr. Rigot reported that his depression had increased somewhat, that he was no longer taking Abilify, and that his Buspar had decreased to 10 nmg. (Tr. 780). As Mr. Rigot notes, the records from Far West indicate that his case manager assisted him with various tasks, including transportation, attending appointments, paying bills, completing paperwork, and shopping. (*See*, *e.g.*, Tr. 432-33, 435, 463, 561, 632, 639, 715, 793).

On May 19, 2012, Mr. Rigot was admitted to Marymount Hospital for depression. (Tr. 300). Mr. Rigot reported suicidal thoughts, a depressed mood, decreased energy level, and a sense of worthlessness. (Tr. 302). Mr. Rigot also indicated that he had two or three prior suicide attempts.

---

[3] The record in this case is voluminous, spanning more than two thousand pages. I have focused my summary of the medical evidence on the evidence highlighted by the parties and the ALJ

(Tr. 303). Mr. Rigot was diagnosed with major depressive disorder and opiate abuse. (Tr. 300). Mr. Rigot's treatment notes state that his bipolar diagnosis remained questionable due to the absence of symptoms suggestive of mania and hypomania. (Tr. 303). Mr. Rigot also stated that he previously had many psychiatric hospital admissions. *Id.*

Mr. Rigot began attending the Center for Effective Living in October 2013. (Tr. 687). On October 28, 2014, Mr. Rigot reported feeling good and that he had been attending AA meetings. (Tr. 813).  The ALJ found that Mr. Rigot's subsequent treatment notes at the Center for Effective Living showed that his mental status was relatively stable. (Tr. 1652). However, the ALJ also found that his treatment notes from March 30, 2015 through November 10, 2017 reflected that Mr. Rigot reported feeling overwhelmed, angry, stressed, and craving substances. (Tr. 1652).

On May 24, 2016, Mr. Rigot reported that he had gone on a recent outing with his church friends to a casino. (Tr. 1514). On June 21, 2016, the Center for Assisted Living helped him complete forms for a job meeting the following week. (Tr. 1512).  On March 14, 2017, it was noted that Mr. Rigot appeared to be able to keep track of his appointments and care for himself but that he struggled with his ability to progress past self-care. (Tr. 1489). On August 21, 2017, Mr. Rigot reported that his sister was now living with him and that he was helping to care for her. (Tr. 1467). Mr. Rigot also reported that his life was very stressful. *Id.* On January 17, 2019, Mr. Rigot reported that all was going well and that he had recently helped a friend with a part time job. (Tr. 1494).

Mr. Rigot began receiving treatment at the Charak Center in October 2017. (Tr. 1260). At that time, Mr. Rigot's memory was impaired, his insight, judgment, and concentration were poor, his intelligence estimate was below average, and his mood was sad/depressed, and anxious. (Tr. 1262). He reported a history of suicide attempts, with no attempts in the previous two years. *Id.* At a follow up visit on November 22, 2017, Mr. Rigot stated that he had negative thoughts all the

time in his head. (Tr. 1264). Mr. Rigot's demeanor, cognition, memory, insight, judgment, concentration, and mood were within normal limits, and his intelligence was assessed as average. (Tr. 1265). The ALJ determined that Mr. Rigot's treatment records after that date showed good mental functioning with normal memory and concentration, and that his thought processes were logical. (Tr. 1651). On April 13, 2018, Mr. Rigot was assessed as having mild depression and anxiety and stated that he had received a new credit card and was in the process of getting a car. (Tr. 2040).

Mr. Rigot was admitted to Rosary Hall for opiate issues on November 1, 2017. (Tr. 1177). It was noted that Mr. Rigot was taking 5 hydrocodone pills or 8 mg of Suboxone a day. *Id*. Mr. Rigot participated in group activities and was discharged on November 6, 2017 in stable condition to follow up with his primary care physician at the Charak Center for outpatient chemical dependency issues. *Id*.

On May 1, 2020, Mr. Rigot was admitted to Lutheran Hospital for depression and suicidal ideation after he told his sister that he was feeling suicidal. (Tr. 2046). Mr. Rigot admitted to using cocaine in the past few weeks. *Id*. Mr. Rigot's behavior was evasive and distractible, his memory was moderately impaired, his attention and concentration were good, his mood was depressed and irritable, his affect was restricted, his insight was poor, and his judgment was grossly impaired. (Tr. 2048-49). He was assessed as a suicide risk. (Tr. 2049). Mr. Rigot was discharged on May 7, 2020. (Tr. 2054). At discharge, Mr. Rigot's behavior, insight, and judgment were appropriate, and he demonstrated no suicidal ideations. (Tr. 2056).

## IV.    THE ALJ'S DECISION

On April 26, 2021, the ALJ issued a written decision partially denying Mr. Rigot's claim. (Tr. 1629). The ALJ first determined that Mr. Rigot had not engaged in substantial gainful activity since April 29, 2013, the date of his application. (Tr. 1639). The ALJ then found that Mr. Rigot

had the following severe impairments: anxiety disorder; major depressive disorder; borderline intellectual functioning; opioid, alcohol, and cocaine use disorders; chronic obstructive pulmonary disorder ("COPD"); status-post stress fracture and calcaneal fracture of the left foot; and mitral regurgitation and mild stenosis. *Id*.

The ALJ next determined that Mr. Rigot did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 1640). The ALJ next determined that Mr. Rigot had the residual functional capacity to:

> perform light work as defined in 20 CFR 416.967(b) except frequently push/pull bilaterally and parallel to the ground; constantly use foot pedals; frequently climb ramps, stairs, ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, or crawl; frequently reach overhead with the left upper extremity; occasionally reach overhead with the right upper extremity; constantly handle, finger, and feel; avoid high concentrations of cold, smoke, fumes, pollutants, and dust; can understand, remember, and carry out simple instructions in a routine and repetitive work environment without strict production quotas (i.e. no piece-rate type work); can interact with the public, coworkers, and supervisors, up to occasionally, and engage in superficial type contact, such as asking questions, clarifying instructions, pointing to where things should be placed, no conflict resolution or directing the work of others; and no commercial driving

(Tr. 1647).

The ALJ next determined that Mr. Rigot had no past relevant work. (Tr. 1673). The ALJ also determined that Mr. Rigot's age category changed to an individual of advanced age on April 15, 2021 because Mr. Rigot was approaching a higher age category and because of the significant adverse impact of all factors on Mr. Rigot's ability to adjust to other work. (Tr. 1674). The ALJ determined that, prior to April 15, 2021, there were jobs existing in significant numbers in the national economy that Mr. Rigot could perform, including marker, garment sorter, and classifier. (Tr. 1674-75). However, the ALJ determined that after Mr. Rigot's age category changed on April 15, 2021, there were no jobs existing in significant numbers in the national economy that Mr. Rigot

could perform. (Tr. 1675). Accordingly, the ALJ found that Mr. Rigot was not disabled prior to April 15, 2021, but that he became disabled on that date and continued to be disabled through the date of the decision. *Id*.

## V.    LAW & ANALYSIS

### A.    Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by

substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.  Standard for Disability

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a

claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g); *see Abbott*, 905 F.2d at 923.

### C.  <u>Analysis</u>

Mr. Rigot argues that the ALJ erred at Step Four because the ALJ found that Mr. Rigot could sustain full time employment without properly crediting his testimony that he needs substantial assistance to complete activities of daily living. Mr. Rigot also argues that the ALJ erroneously rejected the statements of Ms. Nichols and Ms. Sexton-Bruno regarding Mr. Rigot's need for assistance. For the reasons set forth below, Mr. Rigot's arguments fail.

#### 1.  **SSR 16-3p**

Mr. Rigot first argues that the ALJ violated SSR 16-3p, which sets forth the procedure by

which the SSA will evaluate a claimant's statements regarding his or her symptoms. SSR 16-3p provides that the SSA will conduct a two-step process in considering a claimant's symptoms. 2017 WL 5180304, at *3 (Oct. 25, 2017).[4] At step one, the SSA determines whether the individual has one or more medically determinable impairments that could reasonably be expected to produce the individual's alleged symptoms. *Id*. If so, at step two, the agency evaluates the intensity and persistence of a claimant's symptoms to determine the extent to which those symptoms limit the claimant's ability to work. *Id*. at *4.

With respect to a claimant's subjective statements, SSR 16-3p provides that the SSA will "consider an individual's statements about the intensity, persistence, and limiting effects of symptoms" and "will evaluate whether the statements are consistent with objective medical evidence and the other evidence." *Id*. at *6. SSR 16-3p identifies seven factors that the agency will consider in evaluating an individual's symptoms: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. *Id*. at *7-8. "The ALJ need not analyze all seven factors but should show that she considered the relevant evidence." *Phillips v. Comm'r of Soc. Sec. Admin*., No. 3:22-CV-01144-JGC, 2023 WL 4078204, at *8 (N.D. Ohio Apr. 4, 2023), *report and recommendation adopted*, 2023 WL 5602726 (N.D. Ohio Aug. 30, 2023).

Notably, "[a] plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ, as an ALJ is not required to accept a claimant's subjective complaints." *Zingale v. Kijakazi*, No. 1:20-cv-02197,

---

[4] While SSR 16-3p was issued on March 28, 2016, after Mr. Rigot filed his disability claim, SSR 16-3p provides that it applies to all determinations and decisions made after that date. 2017 WL 5180304 at *13 n.27.

2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022); *see also Jones v. Comm'r of Soc. Sec.*, 336

F.3d 469, 476 (6th Cir. 2003) ("an ALJ is not required to accept a claimant's subjective

complaints"). Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge

the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165,

171 (6th Cir. 2020). However, while determinations regarding subjective complaints rest with the

ALJ, "those determinations must be reasonable and supported by substantial evidence." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*,

No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . .

must be rooted in the record and must contain specific reasons for the weight given to the

[claimant's] symptoms.") (quotations omitted).

The ALJ found that Mr. Rigot's statements regarding his symptoms were "not entirely

consistent with medical evidence and other evidence in the record," (Tr. 1648), stating as follows:

> The claimant reported disability related to depression, difficulty
> concentrating, following instructions, and needing help from others with
> managing his finances, cooking, and cleaning (Testimony). Despite these
> allegations, the claimant's reported daily functioning does not support a
> marked, serious, or worse degree of limitation in any areas of mental
> functioning. The claimant reported that in a typical day, he wakes up at
> noon, watches television, attends medical appointments, if he has any,
> and walks to the store to get groceries (Testimony). In the medical record,
> the claimant reported caring for his sister (B33F/4, 9), and attending AA
> consistently (B33F/15, 16). On January 17, 2019, the claimant reported
> "all is going well" and he noted recently helping his friend with his part
> time job (B33F/36). On June 21, 2016, the claimant's therapist helped
> him complete forms for a job meeting the following week (B33F/54). On
> May 24, 2016, the claimant reported a recent outing with church and
> friends to a casino (B33F/56). On April 12, 2016, the claimant reported
> that he wanted a job that was not repetitious, not too difficult, part-time,
> and for which he can use public transportation (B33F/75). On March 14,
> 2017, the claimant's therapist noted that he appears able to keep track of
> appointments and care for himself (B33F/31). On April 13, 2018, the
> claimant noted that his medications were working out well; he had mild
> depression and anxiety; he was in the process of getting a car; he got a
> new credit card; and he denied medication side effects (B36F/167). On
> July 28, 2020, the claimant reported "walking a lot" and getting around
> by using public transportation (B38F/1). This reported functioning

> reflects that the claimant has demonstrated the mental functioning to use
> public transportation, shop for groceries, attend appointments, perform
> some work activity, keep track of appointments, care for his sister,
> interact with others in public, maintain his medication, ask for assistance
> when necessary, and manage his daily affairs. This evidence does not
> support significant or marked limitations in any areas of mental
> functioning.

(Tr. 1655).

Mr. Rigot argues that the ALJ erred in relying on his activities of daily living, asserting that "[t]he mere fact that [Mr. Rigot] acknowledged some level of activities, frequently performed with help, is not necessarily indicative of an ability to perform substantial gainful activity for 8 hours a day[.]" (ECF No. 20, PageID # 2529). It is true that the activities the ALJ relied on— including a single outing with church friends, attendance at AA meetings, obtaining a credit card, and some grocery shopping—are relatively minimal. Had the ALJ relied exclusively on those activities, I might conclude that the ALJ's decision was not supported by substantial evidence. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011) (holding that evidence claimant "went to the grocery store, the pharmacy, and church, and that she was able to prepare her own meals most of the time, and usually able to dress herself without assistance" was "hardly consistent with eight hours' worth of typical work activities"); *Schlote v. Astrue*, No. 1:11-cv-01735, 2012 WL 1965765, at *8 (N.D. Ohio May 31, 2012) ("Schlote's ability to place laundry in the washing machine and dryer, occasionally accompany her husband to the grocery store, attend monthly orchid club meetings, care for orchids, and care for exotic pets—though not the heavy chores associated with such care—does not equal the ability to engage in substantial gainful activity.").

However, the ALJ did not rely exclusively on Mr. Rigot's reported daily activities. Rather, the ALJ also found that his statements were inconsistent with the objective medical evidence, including: a November 2017 mental status examination showing that Mr. Rigot had cognition,

insight, memory, judgment, and concentration within normal limits, and average estimated intelligence; records after November 2017 showing good mental functioning, normal memory and concentration, and logical thought processes; records from the Centers from Effective Living showing a generally stable mental status; and subsequent treatment notes showing generally good insight and judgment, impulse control, affect, mood, and demeanor. (TR. 1655-56). The ALJ further found that Mr. Rigot's subjective statements were inconsistent with the opinions of the state agency medical psychological consultants and Dr. Williams. (TR. 1656). The ALJ also acknowledged contrary evidence, including mental status examinations showing impaired memory, poor concentration, a flat or dysphoric affect, impaired abstraction, a sad and depressed mood, and impoverished speech. (Tr. 1655-56). However, the ALJ found that, while treatment records showed "some degree of impairment," they did not demonstrate that Mr. Rigot had experienced significant or marked limitations in any area of mental functioning. (Tr. 1656). Accordingly, the ALJ concluded that Mr. Rigot's subjective complaints were "not entirely consistent with [his] reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions." *Id*.

Reading the decision as a whole, I conclude that the ALJ properly considered the evidence of record in applying SSR 16-3p and evaluating Mr. Rigot's subjective statements. The ALJ's decision is therefore supported by substantial evidence. *See Kinter v. Colvin*, No. 5:15CV1752, 2016 WL 4157425, at *8 (N.D. Ohio Aug. 5, 2016) (holding that ALJ did not err in discounting claimant's testimony where ALJ's findings were based on medical records, claimant's testimony, and other evidence in the record); *Young v. Comm'r of Soc. Sec. Admin*., No. 5:21-cv-00761, 2022 WL 17546359, at *6 (N.D. Ohio Dec. 9, 2022) (holding that ALJ complied with SSR 16-3p where ALJ evaluated the intensity and persistence of claimant's symptoms and determined extent to which those symptoms limited claimant's ability to perform work activities).

Mr. Rigot argues that the ALJ's decision was inconsistent with other treatment notes and the medical opinions of his treating physicians and asserts that the ALJ "failed to address Mr. Rigot's need for support." (ECF No. 20, PageID # 2529). In particular, he cites to opinions from his treating physicians, case manager, and sister that he lacked the ability to carry out an ordinary routine without extensive support. As the Sixth Circuit has held, however, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). To the extent Mr. Rigot believes the ALJ should have weighed the evidence differently or should have put more emphasis on the support structures around him, it is not a reviewing court's role to second-guess the ALJ's judgment. I therefore recommend that the Court reject Mr. Rigot's argument that the ALJ violated SSSR 16-3p.

### 2. **Opinions of Ms. Nichols and Ms. Sexton-Bruno**

Mr. Rigot also argues that the ALJ assigning little weight to the opinions of Ms. Nichols and Ms. Sexton-Bruno. As Mr. Rigot concedes, neither Ms. Nichols nor Ms. Sexton-Bruno is an acceptable medical source. Instead, Ms. Nichols and Ms. Sexton-Bruno are categorized as "non-medical sources." At the time Mr. Rigot filed his application, the SSA's evaluation of evidence from such sources was governed by SSR 06-03p, which provides that the agency "may" use evidence from "other sources" to show "the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *see also Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 550 (6th Cir. 2014) (noting that an ALJ "must consider" other-source opinions, but that those opinions "are not entitled to any special

deference").[5] Because the applicable regulations are somewhat different for non-medical sources who see a claimant in a professional capacity like Ms. Nichols than for friends or family, I will address Mr. Rigot's arguments with respect to Ms. Nichols and Ms. Sexton-Bruno separately.

>        *a.*        ***Ms. Nichols***

Mr. Rigot first argues that the ALJ erred by giving little weight to the opinions of Ms. Nichols, who submitted a letter stating that: Mr. Rigot has a diagnosis of major depressive disorder and anxiety disorder; his depression and anxiety prevent him from working full time; he has prior suicide attempts and hospitalizations for depression; he lives alone with some support from his sister; Ms. Nichols meets with him monthly to ensure that he pays his bills, sticks to his budget, and performs activities of daily living; and without those visits he most likely would not be able to manage his illness and his life. (TR. 1628).

SSR 06-03p states that non-medical sources such as social welfare agency personnel are "valuable sources of evidence for assessing impairment severity and functioning." 2006 WL 2329939 at *3. SSR 06-03p also states that governing regulations "require consideration" of such evidence when evaluating medical opinions, and further notes that the Social Security Act requires the SSA to "consider all of the available evidence in the individual's case record in every case." *Id*. Thus, the ALJ's decision "should reflect" the consideration of opinions from non-medical sources who have seen the claimant in a professional capacity. *Id*. at *6. The ALJ "generally should explain" the weight given to such opinions, or otherwise ensure that discussion of the evidence allows a subsequent reviewer to follow the ALJ's reasoning, when those opinions may have an effect on the outcome of the case. *Id*.

---

[5] The Agency rescinded SSR 06-03p on March 27, 2017. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263 (Mar. 27, 2017). However, the notice of rescission states that the rescission is "effective for claims filed on or after March 27, 2017." *Id*. Because Mr. Rigot's claim was filed before that date, SSR 06-03p remains applicable to his claim. *See Horton v. Comm'r of Soc. Sec. Admin.*, No. 5:19-cv-0321, 2020 WL 896518, at *2 n.34 (N.D. Ohio Feb. 25, 2020), *report and recommendation adopted*, 2020 WL 896518 (N.D. Ohio Feb. 25, 2020) ("Although the Social Security Administration has rescinded SSR 06-03P, this change applies to claims filed after March 27, 2017").

SSR 06-03p also provides that the agency must evaluate evidence from non-medical professional sources like Ms. Nichols using a variety of factors, including: (1) the nature and extent of the relationship between the source and the claimant; (2) the source's qualifications; (3) the source's area of specialty or expertise; (4) the degree to which the source presents relevant evidence to support his or her opinions; (5) whether the opinion is consistent with other evidence; and (6) any other factors that tend to support or refute the opinion. *Id*. at *5. However, "[n]ot every factor for weighing opinion evidence will apply in every case." *Id*.

The ALJ rejected Ms. Nichols' opinions for three reasons: (1) Ms. Nichols' statement that Mr. Rigot could not sustain full-time employment subsumed the ultimate issue of disability; (2) Ms. Nichols is not an acceptable medical source; and (3) "more importantly," Ms. Nichols opinions were inconsistent with Mr. Rigot's examination results, his reported functioning, and the other weighted medical opinions in the record. (Tr. 1667).

As Mr. Rigot concedes, the ALJ did not err in disregarding Ms. Nichols' statement that Mr. Rigot could not sustain full-time employment. 20 C.F.R. § 416.927(d), which is applicable to claims filed before March 27, 2017, provides that the SSA is responsible for making the determination about whether a claimant is disabled. Section 416.927(d) further provides that "[a] statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.: *see also Smith v. Berrihill*, No. 5:17CV2666, at *4 (N.D. Ohio Feb. 20, 2019), *report and recommendation adopted,* 2019 WL 696991 (N.D. Ohio Feb. 20, 2019) (noting that it "would have been an error" for the ALJ to defer to physician's opinion that claimant was disabled and unable to work).

Mr. Rigot also concedes that Ms. Nichols was not an acceptable medical source, but argues that the ALJ was "obligated to consider and evaluate her evaluations and knowledge about Mr. Rigot's need for assistance." (ECF No. 20, PageID # 2535). In particular, Mr. Rigot argues that

the ALJ's decision was inconsistent with SSR 96-8p and SSR 85-16. SSR 96-8p provides in relevant part that an RFC "must be based on *all* of the relevant evidence in the case record," including lay evidence, reports of daily activities, and recorded observations. 1996 WL 374184 at *5. SSR 85-16 governs the agency's treatment of mental impairments, and provides that evidence from non-medical sources "may play a vital role in the determination of the effects of impairment." 1985 WL 56855, at *4 (Jan. 1, 1985). Thus, "relevant, reliable information, obtained from third party sources such as social workers, previous employers, family members, and staff members of halfway houses, mental health centers, and community centers, may be valuable in assessing an individual's level of activities of daily living." *Id*.

However, the ALJ expressly *did* consider Ms. Nichols' opinions, finding that they were inconsistent with his examinations, reported functioning, and other medical opinions in the record. (Tr. 1667). In doing so, the ALJ relied on the same evidence she relied on to conclude that Mr. Rigot's own testimony was not entirely consistent with the record as a whole. *Id*. While Mr. Rigot may disagree with the conclusions that the ALJ reached, the ALJ complied with SSR 96-8p and SSR 85-16 by evaluating Ms. Nichols' statements regarding Mr. Rigot's functioning and determining that they were inconsistent with other evidence in the record. *See Gillis v. Comm'r of Soc. Sec.*, No. 1:12 CV 01087, 2013 WL 1694844, at *16-17 (N.D. Ohio Apr. 1, 2013), *report and recommendation adopted*, 2013 WL 1694809 (N.D. Ohio Apr. 18, 2013) (holding that ALJ complied with SSR 96-8p where ALJ thoroughly analyzed relevant evidence and paid "considerable attention" to plaintiff's subjective testimony); *Drake v. Colvin*, No. 1:14CV0001, 2014 WL 5431322, at *14-15 (N.D. Ohio Oct. 24, 2014) (holding that ALJ complied with SSR 85-16 where ALJ's decision was "sufficiently clear to allow for meaningful review").

Finally, Mr. Rigot argues that the ALJ's decision failed to comply with Listings 12.00(C) and (D). As the Commissioner correctly notes, however, Mr. Rigot is not arguing, following the

Court's rejection of my prior report and recommendation, that he met or medically equaled a listing. Nor has Mr. Rigot cited any case for the proposition that Listing 12.00 is relevant to the Step Four analysis. Accordingly, the ALJ's decision to assign little weight to Ms. Nichols' opinions was supported by substantial evidence.

b. *Ms. Sexton-Bruno*

Mr. Rigot also argues that the ALJ erred in giving little weight to the opinions of his sister, Ms. Sexton-Bruno, including her statements that Mr. Rigot repeatedly lost employment because he could not comprehend instructions and that he was able to manage his life only because he received a significant amount of assistance from others. (Tr. 247-53).

"Though SSR 06-03p states the case record should reflect the consideration of opinions from non-medical sources who see the plaintiff in their professional capacity . . . the ruling has no similar instruction for the case record to reflect the weight given opinions from family and friends." *Cahill v. Comm'r of Soc. Sec.*, No. 1:11 CV 2207, 2013 WL 331228, at *24 (N.D. Ohio Jan. 8, 2013), *report and recommendation adopted*, 2013 WL 331115 (N.D. Ohio Jan. 25, 2013). Instead, "the ALJ is simply required to consider such opinions and accord such the weight [the ALJ] finds appropriate." *Taylor v. Comm'r of Soc. Sec.*, No. 1:17-cv-148, 2018 WL 1478261, at *8 (W.D. Mich. Mar. 7, 2018), *report and recommendation adopted*, 2018 WL 1456514 (W.D. Mich. Mar. 23, 2018) (citing *Engebrecht v. Comm'r of Soc. Sec.*, 572 F. App'x 392, 397-98 (6th Cir. 2014)).

The ALJ provided the following explanation for her decision to assign little weight to Ms. Sexton-Bruno's statements:

> The observations and opinions provided by Ms. Sexton-Bruno do not establish that the claimant is disabled. Since the witness is not medically trained to make exacting observations as to dates, frequencies, types and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms, the accuracy of the observations and opinions is questionable. Moreover, by virtue of the relationship as the

> claimant's sister the witness cannot be considered a disinterested third
> party witness whose representations would not tend to be colored by
> affection for the claimant and a natural tendency to agree with the
> symptoms and limitations the claimant alleges. Most importantly,
> significant weight cannot be given to the information provided because
> it, like the claimant's, is simply not consistent with the preponderance of
> the evidence.

(Tr. 1673).

Mr. Rigot argues that it was improper for the ALJ to discount Ms. Sexton-Bruno's statements on the basis that they were colored by affection for Mr. Rigot. If the ALJ had discounted Ms. Sexton-Bruno's opinion solely on the basis that she is Mr. Rigot's sister, remand would arguably be appropriate. Courts in this circuit have held that "rejecting third party opinions because of familial bias is improper under social security regulations." *Claudio v. Saul*, No. 1:19CV00383, 2020 WL 1187252, at *7 (N.D. Ohio Mar. 12, 2020) (citing cases); *see also Miller v. Comm'r of Soc. Sec.*, No. 15-12567, 2016 WL 4761607, at *8 (E.D. Mich. July 21, 2016), *report and recommendation adopted*, 2016 WL 4729650 (E.D. Mich. Sept. 12, 2016) ("'The fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony. To the contrary, testimony from lay witnesses who see the claimant every day is of particular value; such lay witnesses will often be family members.'") (quoting *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)); *but see Kidd v. Colvin*, No. 1:13-CV-02224, 2014 WL 7238347, at *7 (N.D. Ohio Dec. 17, 2014) (holding that ALJ did not err in discounting statements from claimant's family and friends on basis that they "are not medical professionals and they are biased towards the claimant due to the nature of their relationship with him").

However, the ALJ did not rely solely on Ms. Sexton-Bruno's alleged bias. Instead, the ALJ also found that Ms. Sexton-Bruno was not medically trained and, "most importantly," that the information she provided "like the claimant's, is simply not consistent with the preponderance of the evidence." (Tr. 1673). Courts have held that remand is not warranted when an ALJ relies on

reasons other than bias in rejecting a lay opinion from a friend or family member. *See Miller*, 2016 WL 4761607 at *9 (holding that, while alleged bias was insufficient ground to reject opinion, ALJ complied with governing regulations where ALJ "made clear that bias was not the primary reason for the rejection" and that opinion was primarily rejected because it was inconsistent with medical evidence); *Albright v. Comm'r of Soc. Sec.*, No. 16-14100, 2018 WL 4560921, at *4 (E.D. Mich. Sept. 24, 2018) (holding that ALJ did not err in evaluation of father's statements where ALJ "did not simply dismiss [them] as discredited due to family loyalties," but rather "evaluated the father's statements in light of other record evidence and explained why she found his statements in conflict with other record evidence"). As with Mr. Rigot's own statements as Ms. Nichols' opinion, the ALJ here properly relied on Mr. Rigot's activities of daily living and other evidence in the record in determining that Ms. Sexton-Bruno's opinions were inconsistent with the record as a whole.

Mr. Rigot also argues that the ALJ violated Listing 12.00D because that listing requires the ALJ to consider the observations of family, friends, and others who have knowledge of the claimant's functioning. As noted above, however, Mr. Rigot is not arguing that he met or equaled a listing and has not established that Listing 12.00D is relevant to the Step Four analysis. Regardless, the ALJ did consider Ms. Sexton-Bruno's statements and whether those statements were consistent with the evidence. Accordingly, I recommend that the Court reject Mr. Rigot's argument that the ALJ erred in assigning little weight to the opinions of Ms. Sexton-Bruno.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the ALJ's decision.


Dated:  July 25, 2024                                    */s/ Jennifer Dowdell Armstrong*
                                                        Jennifer Dowdell Armstrong
                                                        U.S. Magistrate Judge

**NOTICE TO PARTIES REGARDING OBJECTIONS**

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates

Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).